28 A.3d 399 (2011)
Emmett TAYLOR, Defendant Below, Appellant,
v.
STATE of Delaware, Plaintiff Below, Appellee.
Nos. 153, 2010, 167, 2010.
Supreme Court of Delaware.
Submitted: July 27, 2011.
Decided: September 12, 2011.
*402 Nicole M. Walker (argued) and Santino Ceccotti of the Office of the Public Defender, Wilmington, Delaware, for appellant.
Paul R. Wallace (argued), Abby Adams and Maria Knoll of the Department of Justice, Wilmington, Delaware, for appellee.
Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices constituting the Court en banc.
STEELE, Chief Justice:
Police arrested Emmett Taylor on August 17, 2007, and charged him with several crimes arising from the death of his fiancée, Stephanie Mumford. The trial judge, pursuant to Cooke v. State,[1] barred Taylor's trial counsel from seeking a guilty but mentally ill verdict. The jury convicted Taylor of all offenses and the trial judge sentenced him to death. Taylor appeals his convictions and death sentence. We affirm.

I. FACTS AND PROCEDURAL HISTORY
Emmett Taylor and Stephanie Mumford, set to wed on August 18, 2007, scheduled a rehearsal in Georgetown for August 14, 2007. When they failed to arrive at the rehearsal, Mumford's family drove to the townhouse the couple shared in Millsboro. When the family arrived at the townhouse, they found Mumford's body behind the door of the second floor bathroom. The family noticed a warped frying pan on the kitchen island, along with damage to the drywall and blood all over the kitchen and bathroom. Taylor and the couple's car were missing. The family later found a butcher knife on top of the refrigerator and gave it to police.
*403 Based on an autopsy, the medical examiner opined that the cause of Mumford's death was blunt force trauma to the head and that the manner of death was homicide. Doctors officially pronounced Mumford dead at 9:36 p.m. on August 14. The medical examiner did not provide an opinion regarding the actual time of Mumford's death.
On August 17, 2007, police located Taylor in Washington DC and took him into custody in connection with Mumford's death. When police seized Taylor, they also seized two cell phones from his carone was his and the other was Mumford's. Police forensically examined the phones and obtained call histories, videos, and photos from them. Some of the photos they retrieved from Taylor's phone showed Mumford lying on the floor of their townhouse with cucumbers inserted in her mouth, vagina, and anus. The time stamps on the images ranged from 12:23 a.m. to 12:35 a.m. on August 14, 2007.
Detective William Porter interrogated Taylor in Washington D.C. Taylor told Porter that on the night of Mumford's deaththe night of August 13th into August 14thTaylor told Mumford that he was having second thoughts about their wedding. According to Taylor, Mumford stood next to the kitchen sink cutting food for dinner while the two argued. Taylor explained that he headed toward Mumford to get something from the cupboard when she turned toward him with the knife she was using to cut food. Taylor said that he grabbed her wrist and went into what he called a "self defense mechanism." He then explained that he struck her with a frying pan several times before she gave up the knife.
Mi Jung, the couple's next door neighbor, testified at trial that she heard loud banging noises coming from the couple's townhouse between 10:00 and 10:30 p.m. on August 13, along with Taylor screaming at Stephanie. Jung testified that she never heard Mumford's voice in response. Jung also testified that this was unusual because she generally had heard Mumford's voice along with Taylor's voice when the couple had argued in the past.
Taylor told Porter that he did not believe Mumford pointed the knife at him intentionally and she never threatened him with it. Taylor claimed he was in a rage because she had a knife pointed at him despite everything he had done for her. This account conflicts with what Taylor later told Dr. Zingaro, a licensed psychologist that Taylor's attorneys retained.[2]
According to Taylor, the argument ended and he told Mumford that he wanted to leave for a while to clear his mind. He said that Mumford became angry because she thought he was going to see another woman. He explained that she threw the car keys at him, and then, when he was heading down the steps toward the garage, she jumped on his back. He explained that the two of them fell together down the stairs and rammed into the wall at the bottom of the steps. The weight of their bodies, according to him, caused a hole in the drywall, and Mumford absorbed most of the impact from the fall.
Taylor told Zingaro that he was not trying to kill Mumfordonly trying to get away from herbut he also told and showed Porter that he had no defensive wounds, injuries, or scratches. He also agreed with Porter's characterization of the incident as a one-sided fight. Taylor told both Zingaro and the trial judge that after they fell down the stairs, he and *404 Mumford had sex using cucumbers at her request.
According to Taylor, after the couple had sex, Mumford's head began to swell from their fall down the stairs. While Taylor says he insisted that she go to the hospital, Mumford refused. Instead, Taylor explained, he helped Mumford to the bathroom so she could clean up. He said that he went to the living room and fell asleep on the sofa while she remained in the bathroom, only to awake later to find her dead on the bathroom floor. He explained that he then changed his clothes and left for Washington D.C., where police arrested him.
Zingaro met with Taylor multiple times over a two year period. He noted that Taylor displayed characteristics of Dissociative Identity Disorder. Defense counsel concluded that evidence of Taylor's mental illness would support a GBMI verdict with respect to either the intentional murder charge or a lesser included offense.
In preparation for Taylor's jury trial, however, Taylor and his attorneys reached a fundamental disagreement about trial strategy. Specifically, he faced charges of capital murder, Possession of a Deadly Weapon During the Commission of a Felony, and Abuse of a Corpse. With respect to the capital murder charge, Taylor preferred a not guilty verdict by virtue of a theory of accident or self-defense, while his attorneys wanted to seek a GBMI verdict. His attorneys did not believe that the evidence supported a plausible theory of accident or self defense. They believed that if Taylor pursued self defense or accident, he risked not only a conviction, but also a death sentence. They also knew that when a jury returns a GBMI verdict, the jury must consider that verdict as a mitigating factor in the penalty phase of a capital murder trial.
Taylor sought to fire his attorneys. His attorneys filed a Motion to Withdraw, citing their fundamental disagreement with Taylor regarding trial strategy. The trial judge held a series of ex parte hearings with Taylor and his attorneys to assess the disagreement, but postponed the ultimate resolution until after this court decided Cooke v. State. Ultimately, the trial judge refused to dismiss defense counsel and ruled that, under Cooke, they could not seek a GBMI verdict or introduce GBMI evidence.
At his jury trial, Taylor moved for judgment of acquittal on the Abuse of a Corpse charge, claiming that the State had failed to establish Mumford's time of death. The trial judge denied this motion and the jury found Taylor guilty of all charges. At the penalty phase, the jury recommended death by an eleven to one vote. The trial judge, at sentencing, determined that the State had established one statutory aggravating factor and all nine of its alleged non-statutory aggravating factors. The judge also found fourteen of the sixteen proposed mitigating circumstances. After weighing these various factors, the judge sentenced Taylor to death.

II. STANDARD OF REVIEW
We review the alleged denial of a constitutional right de novo.[3] We also review de novo the sufficiency of the evidence to support a conviction in order to determine whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the defendant guilty beyond a reasonable doubt.[4] The Delaware Criminal *405 Code requires that we review Taylor's death sentence to determine whether (1) the evidence supports, beyond a reasonable doubt, the jury's finding of the particular aggravating circumstances, (2) the judge arbitrarily or capriciously imposed the death sentence or the jury arbitrarily or capriciously recommended it, and (3) the sentence is disproportionate to the penalty imposed in similar cases.[5]

III. ANALYSIS
Taylor's appellate counsel makes four primary arguments in this appeal. First, counsel contend that the trial judge denied Taylor his Sixth Amendment right to the effective assistance of counsel. Specifically, counsel contend it was error for the judge to prevent defense counsel from pursuing a GBMI verdict over Taylor's objection after failing to engage in the inquiry they contend Cooke requires. Essentially, counsel contend that Cooke does not establish a bright line rule against arguing GBMI over a defendant's objection, but rather requires the trial judge to determine the propriety of counsel's representation under the individual circumstances of a particular case. Second, they contend that our opinion in Cooke, if read to support the trial judge's ruling in this case, violates the Sixth Amendment. Third, they assert that the trial judge erred when he denied Taylor's Motion for Acquittal on the Abuse of a Corpse charge because the State failed to present sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Mumford was, in fact, dead at the time of the alleged abuse. Finally, they contend that the trial judge arbitrarily and capriciously imposed the death sentence by not individually addressing each mitigating circumstance. We reject each argument.

A. The trial judge correctly prevented Taylor's attorneys from arguing for GBMI over Taylor's objection.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... have the Assistance of Counsel for his defence."[6] The United States Supreme Court has clarified that the right to counsel means "the right to the effective assistance of counsel."[7] The purpose of this right is to "ensure a fair trial" and "ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding."[8] Accordingly, counsel may not "so undermine[] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[9]
When an attorney represents a defendant, the authority to manage the day-to-day conduct of the trial generally rests with the attorney.[10] An attorney who represents a criminal defendant has *406 an "overarching duty to advocate the defendant's cause and more particular duties to consult with the defendant on important decisions."[11] To be sure, the attorney's duty to consult with the defendant regarding "important decisions"including questions of overarching defense strategydoes not require counsel to obtain the defendant's consent to "every tactical decision."[12] Certain decisions regarding the exercise or waiver of basic rights are so personal to the defendant, however, that "they cannot be made for the defendant by a surrogate."[13]
A criminal defendant has "ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal."[14] This Court has recognized that these choices "implicate inherently personal rights which would call into question the fundamental fairness of the trial if made by anyone other than the defendant."[15] In fact, we have explicitly acknowledged that this principle may sometimes make the defendant worse off than if defense counsel had the final say in a disputed matter: "Although these fundamental decisions are indeed strategic choices that counsel might be better able to make, because the consequences of them are the defendant's alone, they are too important to be made by anyone else."[16]
Therefore, with regard to basic decisions about the objectives of representation, a lawyer must "both consult with the defendant and obtain consent to the recommended course of action."[17] As an important corollary, "counsel cannot undermine the defendant's right to make these personal and fundamental decisions by ignoring the defendant's choice and arguing affirmatively against the defendant's chosen objective."[18] As we explained in Cooke, this principle is consistent with the Delaware Lawyers' Rules of Professional Conduct.[19]
One of the fundamental decisions a defendant alone is empowered to make is his plea.[20] In Delaware, "[a] defendant may plead not guilty, guilty, nolo contendere, or guilty but mentally ill."[21] *407 A Delaware defendant may also "raise the `defense' of `guilty but mentally ill' at trial."[22] In Cooke, the defendant was competent to stand trial and decided, against the advice of counsel, to plead not guilty instead of pleading guilty but mentally ill.[23] Nevertheless, his attorneys advised the trial judge that they planned to ask the jury, over Cooke's "vociferous and repeated protestations" that he was innocent, to find him guilty but mentally ill.[24]
This Court found Cooke's attorneys' conduct violated the United States Constitution for two reasons. First, Cooke completely lacked the "assistance" of counsel in pursuing his chosen trial objectivea not guilty verdict.[25] Because we presume prejudice in cases of the total failure of counsel, Cooke's attorneys' strategy violated his Sixth Amendment rights and warranted automatic reversal under United States v. Cronic.[26] Second, Cooke's attorneys' conduct denied him the benefit of the reasonable doubt standard and meaningful adversarial testing of the State's case against him.[27] Consequently, we concluded that Cooke's attorneys effectively negated his fundamental due process right to enter a plea of not guilty by pursuing their conflicting objective to have the jury find him guilty but mentally ill.[28] In the opinion, however, this Court acknowledged that the United States Supreme Court's holding in Florida v. Nixon instructed that we should not presume prejudice when defense counsel concedes guilt "after consultation with the defendant yields no response."[29]
In this appeal, Taylor's attorneys assert that Cooke does not establish a per se rule against arguing GBMI over a competent defendant's objection. We disagree. Specifically, his attorneys argue here that our opinion in Cooke requires a trial judge to "inquire into the propriety of counsel's representation" in each particular case and then decide who should make the ultimate decision whether to argue GBMIthe attorney or the client. This assertion misinterprets Cooke. Indeed, in Cooke, we stated plainly: "The trial court [has] a duty to inquire into the propriety of the representation."[30] This statement means that the trial judge has a duty to determine whether there is indeed a conflict between attorney and client; it does not mean the judge has a dutyor the authorityto determine under specific factual circumstances whose views should prevail. If there is a conflict, under Cooke, the judge must protect the defendant's right to "raise [or not raise] the `defense' of `guilty but mentally ill' at trial."[31]
At oral argument, Taylor's appellate counsel argued that this case is wholly different from Cooke. She asserted that *408 in Cooke the attorneys argued GBMI to the jury in direct contravention of the defendant's clearly stated intent, amounting to ineffective assistance of counsel. But, in this case, she asserted the attorneys wanted the same outcome as Taylor, but they wanted to "keep GBMI as an arrow in the quiver" as a sort of alternative argument.[32] According to Taylor's appellate counsel, the trial judge wrongfully denied them the ability to do this, thereby resulting in Taylor's counsel being constitutionally ineffective. Taylor's appellate counsel even directed this Court to citations in the appellate record that would prove that Taylor's attorneys wanted the same outcome that Taylor wanted. After examining the record, we disagree with appellate counsel and find this case is factually similar to Cooke.
On the record before us, Taylor opposed his attorneys' attempt to argue to the jury that he was guilty but mentally ill of any offense. Taylor's trial counsel acknowledged as much in their Motion for Continuance. Even if Taylor's appellate attorneys are correct that Taylor's not guilty plea for the murder charge is logically consistent with arguing that GBMI should apply to one or more lesser included offensesa proposition that we do not decide hereTaylor opposed this strategy. At various points in time, to the judge and his attorneys, Taylor privately acknowledged that he may, indeed, be guilty of some offense other than murder. These private acknowledgements, however, are different from consenting to argue guilt or guilty but mentally ill to a jury.
Therefore, an irreconcilable conflict existed between Taylor's desired result, a not guilty verdict, and his counsel's proposed strategy of "rais[ing] the `defense' of `guilty but mentally ill' at trial."[33] The trial judge, after several ex parte hearings with Taylor and his counsel, concluded "[t]he defense, throughout the trial, cannot admit guilt if the defendant wants to plead not guilty. Again, the defense counsel cannot undermine the defendant's testimony or his chosen theory of the case." In other words, the trial judge denied Taylor's attorneys the opportunity to present GBMI to the jury, thereby overriding Taylor's plain intent to seek a not guilty verdict. This ruling protected Taylor's individual right to determine whether or not to present a defense of GBMI to the jury, was appropriate under our law, and did not deprive Taylor of the effective assistance of counsel.[34]
In deciding this case and applying our analysis from Cooke, we reaffirm Cooke. We do not agree, as Taylor's attorneys assert, that Cooke runs afoul of the Sixth Amendment standing alone or in its application here.

B. There was sufficient evidence for a rational jury to convict Taylor of Abuse of a Corpse.

In order to establish Taylor's guilt for Abuse of a Corpse, the State must establish that he "treat[ed] a corpse in a *409 way that a reasonable person knows would outrage ordinary family sensibilities."[35] The statute does not define the term "corpse." Taylor argues that the State presented insufficient evidence for a jury to find him guilty of Abuse of a Corpse because there is no evidence that Mumford was actually dead when he took photos of her with cucumbers inserted into her mouth, anus, and vagina. To reiterate, we review de novo the sufficiency of the evidence supporting Taylor's conviction to determine whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could have found Taylor guilty beyond a reasonable doubt.[36]
In this case, there was sufficient evidence for a rational jury to find Taylor guilty beyond a reasonable doubt of Abuse of a Corpse. Between 12:23 a.m. and 12:35 a.m. on the night in question, Taylor took ten pictures on his cell phone of Mumford in the condition described above. Although doctors did not officially declare Mumford dead until 9:36 p.m. the following night, nothing in the Delaware Criminal Code requires an official pronouncement of death in order to convict someone of Abuse of a Corpse. Furthermore, while the medical examiner could not opine to a degree of medical certainty whether the pictures depict Mumford dead, unconscious, or otherwise, Taylor admitted that she was dead by 3 or 4 a.m. The condition of the apartmentwith a lot of blood, the warped frying pan, and the hole in the drywall, among other factorsindicated a serious struggle. Mi Jung, the couple's neighbor, testified that she heard loud banging noises and Taylor's screams between 10 and 10:30 p.m. Notably, she testified that she did not hear Mumford's voice, even though she had heard it during previous altercations between the couple. On the basis of all these facts, construed in the light most favorable to the State, a rational jury could have concluded beyond a reasonable doubt, as the jury in this case did, that Mumford was dead at the time when Taylor took the cell phone pictures of her body.

C. The trial judge properly sentenced Taylor to death after carefully considering relevant aggravating and mitigating factors.

Taylor asserts that the trial judge erred when he improperly weighed the aggravating and mitigating factors by failing to discuss individually and in detail each mitigating circumstance. According to Taylor, this failure resulted in the trial judge's imposition of his death sentence being arbitrary and capricious. Specifically, Taylor argues that the judge erred by failing to discuss five of fourteen established mitigating factors and by minimizing the degree of physical and emotional trauma and the exposure to domestic violence that Taylor suffered during his life.
So long as a death sentence is "the product of a deliberate, rational and logical deductive process," it is not arbitrary or capricious.[37] The analysis in which a trial judge must engage "is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present."[38] Accordingly, a trial judge *410 must engage a carefully reasoned analysisnot a mechanistic formulawhen considering a death sentence.
Taylor's argument is inconsistent with this principle because it would require the sentencing judge in every case, on the record, to inscribe some arbitrary minimum amount of discussion for each mitigating factor individually, regardless of its nature, significance, or weight. Requiring this approach would reflect a preference for form over substancean arrangement that would run somewhat contrary to the "deliberate, rational and logical deductive process" that the law requires.[39] Certainly length and detail of consideration given the mitigating factors by a trial judge are factors relevant to our review of the "totality of evidence" insofar as they indicate that the judge engaged in a thoughtful process. But, we cannot agree that a judge's failure to discuss each mitigating factor for some arbitrary page length makes imposition of a death sentence automatically arbitrary or capricious.
Here, the judge's analysis of the aggravating and mitigating factors was sufficiently careful and deliberate. On March 12, 2010, the judge issued a nineteen page opinion. In it, he concluded that the State had established all nine of the non-statutory aggravating circumstances it had alleged and that Taylor had established fourteen of the sixteen mitigating circumstances he had alleged. Taylor even admits that the judge explicitly considered nine of the fourteen established mitigators.[40] Ultimately, the judge concluded that despite a difficult childhood, Taylor had a number of positive influences in his life. These included loving grandparents, the opportunity for a college education, military service, and skills as a carpenter. The judge also observed that at the time of the murder, Taylor had a nice home, a job, and Mumford's love. In light of these circumstances, the judge found that the mitigating factors deserved little weight because Taylor neither had a bad life nor a future without the hope of an even better life. This discussion of Taylor's life evidences an appropriately careful and reasoned analysis by the trial judge.
Finally, Taylor argues that because the judge failed to address several mitigating factors, it is impossible for this Court to adequately review whether imposition of the death penalty in this case was proportionate to the penalty recommended in similar cases, as the law requires.[41] We review capital punishment cases for proportionality to ensure that the death sentence imposed in a specific case is not an aberration. But, we need not find an identical case where we affirmed a death sentence in order to find that Taylor's sentence is proportionate to his crime.[42] We consider the factual background of first degree murder cases to determine the proportionality of a particular sentence.[43] Relevant factors include the gravity of the *411 offense and the circumstances of the crime.[44]
Taylor's sentence here is similar to the result in other cases where the murder victim was a current or former lover.[45] Like the defendant in Weeks v. State, Taylor seems to have shown no remorse for his actions, considering how he abused Mumford's lifeless, battered body.[46] Cases in which we have affirmed death sentences also often feature defendants with records of violent crime whose earlier violent felony convictions operated as aggravating circumstances.[47] Here, as in those cases, Taylor has a prior conviction for Aggravated Assault of an ex-girlfriend. When examining Taylor's case against the universe of first degree murder cases, his death sentence seems consistentproportionatewith penalties upheld in similar cases.[48] Therefore, the judge's imposition of a death sentence in this case was not unlawfully disproportionate.

IV. CONCLUSION
The trial judge properly applied this Court's holding in Cooke to the circumstances of this case and did not deprive Taylor of his Sixth Amendment right to the effective assistance of counsel. Cooke does not violate Sixth Amendment principles. Also, there was sufficient evidence for a rational jury to find Taylor guilty of Abuse of a Corpse beyond a reasonable doubt. Finally, the judge in this case imposed the death sentence after adequately careful and deliberate consideration. Taylor's death sentence, on the facts of this case, is not unlawfully disproportionate compared to the sentences imposed in similar cases. Therefore, we affirm the judgment of the Superior Court.
 APPENDIX A[*]
 Name: Robert Ashley
 Criminal ID: XXXXXXXXXX
 County: New Castle
*412
 Sentence: Life imprisonment (following retrial and second penalty hearing)
 Decision on appeal: 2006 WL 797894 (Del. Mar. 27, 2006)
 Name: Meri-Ya C. Baker
 Criminal ID: 90011925DI
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 1993 WL 557951 (Del. Dec. 30, 1993)
 Name: Jermaine Barnett
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment (following second penalty hearing)
 Decision on appeal: 749 A.2d 1230 (Del.2000) (remanding for new sentencing)
 Name: Hector S. Barrow
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment (following second penalty hearing)
 Decision on appeal: 749 A.2d 1230 (Del.2000) (remanding for new sentencing)
 Name: Tyreek D. Brown
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 1999 WL 485174 (Del. Mar. 1, 1999)
 Name: Justin L. Burrell
 Criminal ID: XXXXXXXXXX
 County: Kent
 Sentence: Life imprisonment
 Decision on appeal: 766 A.2d 19 (Del.2000)
 Name: Luis G. Cabrera
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 747 A.2d 543 (Del.2000)
 Name: Luis G. Cabrera
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Death
 Decision on appeal: 840 A.2d 1256 (Del.2004)
 Name: James B. Clark, Jr.
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Death (judge only)
 Decision on appeal: 672 A.2d 1004 (Del.1996)
 Name: Charles M. Cohen
 Criminal ID: 90001577DI
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: No direct appeal taken
 Name: Donald Cole
 Criminal ID: XXXXXXXXXX
*413
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 922 A.2d 364 (Del.2007)
 Name: James T. Crowe, Jr.
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 1998 WL 736389 (Del. Oct. 8, 1998)
 Name: David F. Dawson
 Criminal ID: 88K00413DI
 County: New Castle (venue changed)
 Sentence: Death
 Decision on appeal: 637 A.2d 57 (Del.1994)
 Name: Byron S. Dickerson
 Criminal ID: 90011926DI
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 1993 WL 541913 (Del. Dec. 21, 1993)
 Name: Cornelius E. Ferguson
 Criminal ID: 91009926DI
 County: New Castle
 Sentence: Death
 Decision on appeal: 642 A.2d 772 (Del.1994)
 Name: Donald Flagg
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: No direct appeal taken
 Name: Freddy Flonnory
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment (following second penalty hearing)
 Decision on appeal: 893 A.2d 507 (Del.2006)
 Name: Sadiki J. Garden
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment ordered on appeal
 Decision on appeal: 844 A.2d 311 (Del.2004)
 Name: Robert J. Garvey
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Appeal: 873 A.2d 291 (Del.2005)
 Name: Robert A. Gattis
 Criminal ID: 90004576DI
 County: New Castle
 Sentence: Death
 Decision on appeal: 637 A.2d 808 (Del.1994)
 Name: Arthur Govan
*414
 Criminal ID: 92010166DI
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 1995 WL 48359 (Del. Jan. 30, 1995)
 Name: Tyrone N. Guy
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 913 A.2d 558 (Del.2006)
 Name: Jason Anthony Hainey
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Appeal: 878 A.2d 430 (Del.2005)
 Name: Ronald T. Hankins
 Criminal ID: XXXXXXXXXXA
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 976 A.2d 839 (Del.2009)
 Name: Akbar Hassan-El
 Criminal ID: XXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 911 A.2d 385 (Del.2006)
 Name: Robert W. Jackson, III
 Criminal ID: 92003717
 County: New Castle
 Sentence: Death
 Decision on appeal: 684 A.2d 745 (Del.1996)
 Name: Larry Johnson
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 878 A.2d 422 (Del.2005)
 Name: Shannon Johnson
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Death
 Decision on appeal: 983 A.2d 904 (Del.2009)
 Name: David Jones
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 798 A.2d 1013 (Del.2002)
 Name: Michael Jones
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 940 A.2d 1 (Del.2007).
*415
 Name: Michael Keyser
 Criminal ID: XXXXXXXXXX
 County: Kent
 Sentence: Life imprisonment
 Decision on appeal: 893 A.2d 956 (Del.2006)
 Name: David J. Lawrie
 Criminal ID: 92K03617DI
 County: Kent
 Sentence: Death
 Decision on appeal: 643 A.2d 1336 (Del.1994)
 Name: Thomas M. Magner
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 1998 WL 666726 (Del. July 29, 1998)
 Name: Michael R. Manley
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Death
 Decision on appeal: 918 A.2d 321 (Del.2007)
 Name: Frank W. Moore, Jr.
 Criminal ID: 92S03679DI
 County: Sussex
 Sentence: Life imprisonment
 Decision on appeal: 1994 WL 202289 (Del. May 9, 1994)
 Name: Adam Norcross
 Criminal ID: XXXXXXXXXXA
 County: Kent
 Sentence: Death
 Decision on appeal: 816 A.2d 757 (Del.2003)
 Name: Juan Ortiz
 Criminal ID: XXXXXXXXXX
 County: Kent
 Sentence: Death
 Decision on appeal: 869 A.2d 285 (Del.2005)
 Name: Darrel Page
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 934 A.2d 891 (Del.2007)
 Name: James W. Perez
 Criminal ID: 93001659
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: No. 207, 1993, Moore, J. (Del. Feb. 3, 1994)
 Name: Gary W. Ploof
 Criminal ID: XXXXXXXXXX
 County: Kent
 Sentence: Death
 Decision on appeal: 856 A.2d 539 (Del.2004)
*416
 Name: James Allen Red Dog
 Criminal ID: 91001754DI
 County: New Castle
 Sentence: Death (judge only)
 Decision on appeal: 616 A.2d 298 (Del.1992)
 Name: Luis Reyes
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Death
 Decision on appeal: 819 A.2d 305 (Del.2003)
 Name: James W. Riley
 Criminal ID: XXXXXXXXXX
 County: Kent
 Sentence: Life imprisonment (following retrial)
 Decision on appeal: 2004 WL 2085525 (Del. Oct. 20, 2004)
 Name: Jose Rodriguez
 Criminal ID: 93001668DI
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 1994 WL 679731 (Del. Nov. 29, 1994)
 Name: Richard Roth, Jr.
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 788 A.2d 101 (Del.2001)
 Name: Reginald N. Sanders
 Criminal ID: 91010161DI
 County: New Castle (venue changed)
 Sentence: Life imprisonment (following 1992 resentencing)
 Decision on appeal: 585 A.2d 117 (Del.1990) (remanding for new sentencing)
 Name: Nelson W. Shelton
 Criminal ID: 92000788DI
 County: New Castle
 Sentence: Death
 Decision on appeal: 652 A.2d 1 (Del.1995)
 Name: Donald J. Simmons
 Criminal ID: 92000305DI
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: No direct appeal taken
 Name: Chauncey Starling
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Death (on two counts)
 Decision on appeal: 903 A.2d 758 (Del.2006)
 Name: Brian David Steckel
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Death
*417
 Decision on appeal: 711 A.2d 5 (Del.1998)
 Name: David D. Stevenson
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Death
 Decision on appeal: 918 A.2d 321 (Del.2007)
 Name: Willie G. Sullivan
 Criminal ID: 92K00055
 County: Kent
 Sentence: Death
 Decision on appeal: 636 A.2d 931 (Del.1994)
 Name: Ralph Swan
 Criminal ID: XXXXXXXXXXA
 County: Kent
 Sentence: Death
 Decision on appeal: 820 A.2d 342 (Del.2003)
 Name: Ambrose L. Sykes
 Criminal ID: XXXXXXXXXXX
 County: Kent
 Sentence: Death
 Decision on appeal: 953 A.2d 261 (Del.2008)
 Name: Antonio L. Taylor
 Criminal ID: XXXXXXXXXX
 County: Kent
 Sentence: Life imprisonment
 Decision on appeal: 685 A.2d 349 (Del.1996)
 Name: Milton Taylor
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Death
 Decision on appeal: 822 A.2d 1052 (Del.2003)
 Name: Desmond Torrence
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 2005 WL 2923501 (Del. Nov. 2, 2005)
 Name: Charles H. Trowbridge
 Criminal ID: 91K03044DI
 County: Kent
 Sentence: Life imprisonment
 Decision on appeal: 1996 WL 145788 (Del. Mar. 4, 1996)
 Name: James W. Virdin
 Criminal ID: XXXXXXXXXX
 County: Kent
 Sentence: Life imprisonment
 Decision on appeal: 780 A.2d 1024 (Del.2001)
 Name: John E. Watson
 Criminal ID: 91008490DI
 County: New Castle
*418
 Sentence: Life imprisonment
 Decision on appeal: No direct appeal taken
 Name: Dwayne Weeks
 Criminal ID: 92010167
 County: New Castle
 Sentence: Death
 Decision on appeal: 653 A.2d 266 (Del.1995)
 Name: Joseph Williams
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Life imprisonment
 Decision on appeal: 2003 WL 1740469 (Del. Apr. 1, 2003)
 Name: Roy R. Williamson
 Criminal ID: 93S02210DI
 County: Sussex
 Sentence: Life imprisonment
 Decision on appeal: 669 A.2d 95 (Del.1995)
 Name: Jermaine M. Wright
 Criminal ID: 91004136
 County: New Castle
 Sentence: Death
 Decision on appeal: 671 A.2d 1353 (Del.1996)
 Name: Craig A. Zebroski
 Criminal ID: XXXXXXXXXX
 County: New Castle
 Sentence: Death
 Decision on appeal: 715 A.2d 75 (Del.1998)
NOTES
[1] 977 A.2d 803 (Del.2009).
[2] In fact, Taylor told Zingaro that Mumford grabbed the collar of his shirt and attempted to lunge her body towards him with the knife in her other hand.
[3] Hartman v. State, 918 A.2d 1138, 1140 (Del. 2007).
[4] Maddrey v. State, 975 A.2d 772, 774-75 (Del. 2009) (citing Davis v. State, 706 A.2d 523, 525 (Del. 1998)).
[5] 11 Del. C. § 4209(g)(2); Starling v. State, 903 A.2d 758, 762 (Del.2006).
[6] U.S. CONST. amend. VI; see Gideon v. Wainwright, 372 U.S. 335, 345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (holding that the Sixth Amendment right to counsel in criminal proceedings applies to the states under the Fourteenth Amendment).
[7] McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).
[8] Strickland v. Washington, 466 U.S. 668, 686, 691-92, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See also United States v. Cronic, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).
[9] Strickland, 466 U.S. at 686, 104 S.Ct. 2052.
[10] New York v. Hill, 528 U.S. 110, 114-15, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000); Taylor v. Illinois, 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).
[11] Strickland, 466 U.S. at 688, 104 S.Ct. 2052.
[12] Florida v. Nixon, 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (citing Strickland, 466 U.S. at 688, 104 S.Ct. 2052).
[13] Nixon, 543 U.S. at 187, 125 S.Ct. 551.
[14] Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).
[15] Cooke, 977 A.2d at 841 (quoting Arko v. People, 183 P.3d 555, 558 (Colo.2008)). See also Gonzalez v. United States, 553 U.S. 242, 250, 128 S.Ct. 1765, 170 L.Ed.2d 616 (2008) ("[S]ome basic trial choices are so important that an attorney must seek the client's consent in order to waive the right.") (citing Nixon, 543 U.S. at 187, 125 S.Ct. 551).
[16] Cooke, 977 A.2d at 842
[17] Id. (quoting Nixon, 543 U.S. at 187, 125 S.Ct. 551).
[18] Id.
[19] See id. (citing Del. Lawyers' Rules of Prof'l Conduct R. 1.2, which states that "a lawyer shall abide by a client's decisions concerning the objectives of representation and ... shall consult with the client as to the means by which they are to be pursued.... In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify").
[20] See Gonzalez, 553 U.S. at 247, 128 S.Ct. 1765 (explaining that the right to plead not guilty is a fundamental right that the defendant must waive personally and the attorney cannot waive).
[21] Super. Ct.Crim. R. 11(a).
[22] Cooke, 977 A.2d at 842 (quoting 11 Del. C. § 408).
[23] Id.
[24] Id.
[25] Id. at 843.
[26] Id. at 848-53. See Cronic, 466 U.S. at 659, 104 S.Ct. 2039 (holding that prejudice is presumed "where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"); see also Strickland, 466 U.S. at 687, 104 S.Ct. 2052 (holding that in order to show unconstitutionally ineffective assistance of counsel, a defendant typically must demonstrate prejudice from counsel's alleged error).
[27] Cooke, 977 A.2d at 843 (citing Cronic, 466 U.S. at 656, 104 S.Ct. 2039).
[28] Id.
[29] Id. at 846 (quoting Nixon, 543 U.S. at 178, 125 S.Ct. 551).
[30] Id. at 850.
[31] Id. at 842 (quoting 11 Del. C. § 408).
[32] At oral argument, Taylor's attorney explained that Taylor's trial counsel wanted to argue innocence to the jury, but also wanted to be able to tell the jury that if it was going to find him guilty, then it should find him guilty but mentally ill.
[33] Cooke, 977 A.2d at 843 (quoting 11 Del. C. § 408).
[34] We note that while we do not generally consider claims of ineffective assistance of counsel on direct appeal, the Superior Court proceedings and actions of Taylor's trial counsel are clearly reflected in the record. Cooke, 977 A.2d at 848. The record is sufficient here for our review of Taylor's claim that the trial judge's conduct denied his Sixth Amendment right to the effective assistance of counsel. See id.
[35] 11 Del. C. § 1332.
[36] See Maddrey, 975 A.2d at 774-75.
[37] Starling v. State, 903 A.2d 758, 765 (Del. 2006) (quoting Red Dog v. State, 616 A.2d 298, 310 (Del. 1992)).
[38] Id. (quoting State v. Cohen, 604 A.2d 846, 849 (Del. 1992)).
[39] Id.
[40] Taylor claims the judge failed to discuss mitigating factors 2 (involving Taylor's family history of mental disease), 7 (involving his attempts to identify his "longstanding mental and emotional issues"), 8 (involving his attempts to resume treatment for his mental and emotional issues), 15 (involving the rape of his mother), and 16 (involving the aid he has given his grandmother and her community).
[41] See 11 Del. C. § 4209(g)(2); Starling, 903 A.2d at 762.
[42] See Flamer v. State, 490 A.2d 104, 144 (Del. 1983) (affirming a death sentence on the basis of other "similar"not identical cases).
[43] Zebroski v. State, 715 A.2d 75, 84 (Del. 1998).
[44] See Capano v. State, 781 A.2d 556, 677 (Del.2001) ("An exact comparison of these cases is not practicable, `but a review of some objective factors, including the gravity of the offense, the circumstances surrounding the crime, and the harshness of the penalty is helpful in reaching a determination of whether or not this case fits within a pattern of Delaware death sentence precedent.'" (citing Zebroski, 715 A.2d at 84)).
[45] See, e.g., Weeks v. State, 653 A.2d 266 (Del. 1995) (shooting of wife and her companion); Gattis v. State, 637 A.2d 808 (Del.1994) (shooting death of girlfriend); Lawrie v. State, 643 A.2d 1336 (Del.1994) (arson killing of estranged wife and children).
[46] Weeks, 653 A.2d at 274 ("Immediately following the killing, Weeks showed no remorse.").
[47] See, e.g., Johnson v. State, 983 A.2d 904, 937 (Del.2009) (previous conviction for fourth degree rape); Starling, 903 A.2d at 763-64 (previous convictions for reckless endangering and robbery); Ortiz v. State, 869 A.2d 285, 306-07 (Del.2005) (previous conviction for felony assault and unlawful sexual contact); Clark, 672 A.2d at 1008 (previous conviction for assault with intent to murder); Ferguson v. State, 642 A.2d 772, 784-85 (Del. 1994) (previous Pennsylvania convictions for homicide and aggravated assault); Red Dog, 616 A.2d at 302-03 (previous convictions for robbery and homicide).
[48] This case fits within the pattern of cases where the imposition of the death penalty is appropriate, as reflected in the applicable universe of cases that is attached as Exhibit A to this opinion.
[*] The universe of cases prior to 1991 is set forth in appendices to prior opinions by this Court, and those appendices are incorporated herein by reference. See, e.g., Lawrie v. State, 643 A.2d 1336, 1352-56 (Del.1994).